UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| VICKI FREEMAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case no. 1:15CV132 PLC |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

Vicki Freeman ("Plaintiff") seeks review of the decision of the Social Security Commissioner, Carolyn Colvin, denying her application for Disability Insurance Benefits under the Social Security Act. The parties consented to the exercise of authority by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (ECF No. 4). Because the Court finds that substantial evidence supports the decision to deny benefits, the Court affirms the denial of Plaintiff's application.

### I. Background and Procedural History

In November 2012, Plaintiff filed an application for Disability Insurance Benefits based on the following medical conditions: degenerative disc disease, severe loss of hearing, high cholesterol, high blood pressure, and acid reflux. (Tr. 116-17, 146). The Social Security Administration (SSA) denied Plaintiff's claims, and she filed a timely request for a hearing before an administrative law judge. (Tr. 51-58, 67-68). The SSA granted Plaintiff's request for review and conducted a hearing on May 13, 2014. (Tr. 27-50). In a decision dated May 29, 2014, the ALJ found that Plaintiff "has not been under a disability within the meaning of the Social Security Act from November 4, 2012, through the date of this decision." (Tr. 13). The

SSA Appeals Council denied Plaintiff's subsequent request for review of the ALJ's decision. (Tr. 1-2). Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the Commissioner's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II. The Administrative Proceeding

A. Testimony at Hearing

Plaintiff appeared with counsel at the administrative hearing on May 13, 2014. (Tr. 29). Plaintiff testified that she was sixty years of age, had a high school diploma and a "one-year office certificate," and was 5 foot 4 inches tall and weighed 280 pounds. (Tr. 31-32). Plaintiff stated that she had worked for the same company for thirty-eight years. (Tr. 32). She began her career as a machine operator and, in her final seven years with the company, worked as a production clerk, entering data, filing papers, and making copies. (Tr. 33-34). Plaintiff's employment ended on November 4, 2011 due to downsizing. (Tr. 35).

Plaintiff testified that she suffered back pain, which "gets worse with limited, even limited activity, any activity," "extreme shortness of breath," and carpal tunnel syndrome. (Tr. 35-36). In regard to the symptoms in her hands, Plaintiff explained: "[S]ometimes you go to ta[ke] and pick up something, and a pain'll shoot through the my wrist and I will drop it. And sometimes I have pain all the way up my arms." (Tr. 36). Plaintiff had difficulty "gripping things" and was unable to open jars and sealed water bottles. (Tr. 36-37). Plaintiff had a computer in her home, but used it "sparingly" because "I have trouble with my hands going numb if I use it very often." (Tr. 37). Plaintiff estimated that she was able to use the computer twenty minutes before experiencing numbness. (Id.).

Plaintiff explained that her doctor had recommended surgery for her carpal tunnel syndrome, but she declined surgery because her former coworkers "that had carpal tunnel

surgery…ended up in worse shape than they started off with." (Tr. 38). Plaintiff wore wrist splints, which "cut down on the pain some," but she "still can't grip very well[.]" (Id.).

Plaintiff described constant pain in her lower back, which increased with any movement, walking, or lifting. (Id.). Plaintiff testified that on good days, she can "do some stuff around the house if I take frequent breaks," but, on bad days, "I'm lucky if I can get out of bed." (Tr. 35). Plaintiff stated that, on a good day, she "could probably lift 10 pounds," and, on a bad day, "I can't lift anything. I'd drop it all." (Tr. 39). Plaintiff could not stand longer than five minutes and could walk approximately twenty-five feet before needing to sit down. Plaintiff needed to lie down ten to twenty times per day for approximately twenty minutes. (Tr. 39-40). Plaintiff estimated that she experienced approximately three bad days per week. (Tr. 35).

At the time of the hearing, Plaintiff had not consulted a pulmonologist about her breathing problems because she "d[id]n't have the money." (Tr. 40-41). Plaintiff testified that she was taking the following medications: Piroxicam, Crestor, "Amlodbenaz" for "high blood pressure," Prilosec, and Gaviscon. (Tr. 41-42). Plaintiff explained that the Piroxicam eased the pain in her back and hands enough so that she was "able to function somewhat." (Tr. 42). However, the Piroxicam "irritates my stomach, which irritates the acid reflux . . . ." (Tr. 43).

On a typical good day, Plaintiff washed dishes and did laundry. (Tr. 43-44). Plaintiff also swept the floors, but needed "to stop and rest frequently" because her "back is hurting and I'm short of breath." (Tr. 44). In regard to gardening, Plaintiff testified that, over "the last couple of years, I've been limited to what I can do." (Id.). She explained, "I cannot use a tiller, my husband does that. And, he does the planting. . . . I can go out and pick a tomato or two, or something like that, but I can't really do a whole lot with the gardening." (Id.). Plaintiff had a driver's license and regularly drove thirty minutes to her doctor appointments. (Tr. 45).

Doug Lindahl, a vocational expert, also testified at the hearing. (Tr. 48-49). Mr. Lindahl stated that the duties of a production clerk required "constant reaching, handling and fingering" and the "main part of the job is doing the computer entry." (Tr. 48). The ALJ asked Mr. Lindahl to consider a hypothetical claimant with the same age, education, and work history as Plaintiff who was limited to "to work at the light exertional level. Ability to occasionally climb ladders, ropes and scaffolds, stoop, kneel, crouch, and crawl." (Tr. 49). Mr. Lindahl responded that such person could perform Plaintiff's past work as a machine operator or production clerk. (Tr. 49). However, if the same hypothetical individual were "limited to occasional handling and fingering, bilateral," neither of those options would remain.

B. Relevant Medical Records

On January 12, 2012, Plaintiff visited her primary care physician, Dr. Ted Hatfield, for evaluation and management of hypertension, hyperlipidemia, type 2 diabetes mellitus, and gastroesophageal reflux disease (GERD). (Tr. 231). Plaintiff was generally doing well, but reported nasal congestion and "some esophageal spasms and occasionally her food is hanging up." (Id.). Dr. Hatfield noted that Plaintiff had gained ten pounds since her last visit, and he discussed with Plaintiff the relationship of obesity "to the GERD, reflux and potential for developing esophageal stricture requiring [dilation], etc." (Id.). Plaintiff was taking Crestor, Lotrel, Feldene, and "over-the-counter Prilosec and says that works very well for her." (Tr. 232). Dr. Hatfield recorded the following diagnoses: hypertension, hyperlipidemia, type 2 diabetes mellitus, GERD, osteoarthritis, and exogenous obesity. (Id.).

On February 27, 2012, Dr. Kelly R. Hutson at Backworks Chiropractic began treating Plaintiff's chronic back pain. (Tr. 213). Plaintiff reported that she had been suffering chronic back pain for four to five years, and she had received physical therapy, aquatic therapy,

4

injections, and nerve stripping, all of which provided "little or no relief." (Id.). Plaintiff also noted loss of grip strength and pain in both hands and numbness in her fingers. (Tr. 214). On a functional rating index, Plaintiff stated that she "can do usual work; no extra work" and "can do a few [recreational] activities." (Tr. 215).

Dr. Hutson prescribed Plaintiff three sessions of chiropractic manipulation per week for the next four weeks. (Tr. 216). Plaintiff presented for fifteen sessions between February 28, 2012 and March 30, 2012, and her treatment included spinal vertebral axial decompression of the lumbar region. (Tr. 221-26). On March 30, 2012, Plaintiff's final day of treatment, Dr. Hutson assessed that Plaintiff's "condition is improving" and recommended Plaintiff continue "conservative chiropractic management." (Tr. 226).

In April 2012, Plaintiff underwent a colonoscopy, which revealed an adenomatous polyp. (Tr. 244, 296-300). On May 10, 2012, Plaintiff discussed concerns about her colonoscopy with Dr. Hatfield. (Tr. 232-33). Dr. Hatfield reassured Plaintiff and recommended she repeat the colonoscopy in six months. (Tr. 233). Dr. Hatfield noted: "Otherwise she has no complaints. She has got a big garden." (Id.).

Plaintiff visited Dr. Hatfield again on September 4, 2012 for evaluation and management of her hypertension, hyperlipidemia, type 2 diabetes mellitus, GERD, and osteoarthritis. (Tr. 234-35). Again, Plaintiff stated that she was "doing well and has no real complaints today," and she was taking generic Prevacid "that seems to work as well for her as any of the other medications she had." (Tr. 235). Dr. Hatfield noted that Plaintiff "is talking about her garden, apparently [it] did well." (Id.).

Plaintiff followed up with Dr. Hatfield about her blood pressure on November 7, 2012. (Tr. 236-37). Because Plaintiff complained of "pain with radiation into the buttocks in the right

leg," Dr. Hatfield ordered an MRI and referred Plaintiff to Dr. Franklin Hayward. (Tr. 237). On November 13, 2012, a lumbar spine MRI without contrast revealed "[m]ild to moderate lumbar degenerative spondylosis that is most significant at L1-2 and L3-4 where it produces mild spinal stenosis." (Tr. 249-50).

On December 3, 2012, Plaintiff saw Dr. Hayward at the Heartland Spine Institute. (Tr. 256-57). Plaintiff informed Dr. Hayward that her constant pain limited her ability to work, walk, drive, sleep, and stand. (Tr. 256). Plaintiff reported that a chiropractor previously performed spinal decompression, "which improved her symptoms." (Id.). Plaintiff explained that "[h]er symptoms are worse when she stands and are relieved when she sits," and she described "numbness/tingling in bilateral hands and fingers." (Id.) Dr. Hayward observed that Plaintiff was "significantly overweight" and therefore not a candidate for surgery. (Id.). He recommended "significant weight reduction" to relieve her back pain, suggested bariatric surgery, and "told her that if she has significant weight reduction and continued to have low back pain, she could be reevaluated at that time." (Tr. 257). Plaintiff stated that she was not interested in surgery.

Plaintiff returned to Dr. Hatfield's office on January 4, 2013, and said "she has been doing well, but she [was] very tearful and upset" because "[t]hey eliminated her job at work[.]" (Tr. 313-14). Dr. Hatfield and Plaintiff discussed Dr. Hayward's recommendation that she undergo bariatric surgery, and Plaintiff stated "she is not interested in it." (Tr. 314). Dr. Hatfield refilled Plaintiff's medications and added Xanax. (Tr. 313). Plaintiff followed up with Dr. Hatfield on January 31, 2013 after a bout with enterocolitis. (Tr. 311-12).

On January 22, 2013, Dr. Walter Schroeder examined Plaintiff and evaluated her hearing at the request of the SSA. (Tr. 261-68). Dr. Schroeder wrote: "An audiogram performed

6

reveals a mixed hearing loss in the right ear compatible with the perforation of the tympanic membrane. She has mild to moderate sensorineural hearing loss in the left ear. She currently does wear hearing aid in the left ear." Tr. 268). Based on his examination, Dr. Schroeder concluded:

> Patient does have the ability to perform and sustain work related functions such as sitting, standing, walking, lifting carrying, handling objects, speaking, and traveling. She does have a hearing loss in both ears. She appears to be well aided with aid in the left ear. At least the conductive portion of the hearing loss could be surgically corrected. She will have difficulty hearing without amplification, but with a hearing aid she can hear approximately 80% in a quiet surrounding and approximately 50% in a noisy environment.

(Id.).

On February 13, 2013, Dr. Kenneth Smith completed a consultative examination of Plaintiff's medical records at the request of the SSA. (Tr. 51-59). Dr. Smith diagnosed Plaintiff with the severe impairments of "back disorder – discogenic and degenerative," obesity, and diabetes mellitus, and the non-severe impairments of hyperlipidemia, essential hypertension, and hearing loss. (Tr. 54). Dr. Smith concluded that Plaintiff's statements regarding the intensity, persistence, and functionally limiting effects of her symptoms were not substantiated by the objective medical evidence alone. (Id.). Dr. Smith found that Plaintiff was "partially credible" because her "statements are not fully supported by MER in file" and Plaintiff "did not stop working due to her impairments, instead she stopped working due to her job ending." (Tr. 55).

Dr. Smith imposed the following exertional limitations: occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk about six hours in an eight-hour workday; and sit with normal breaks more than six hours on a sustained basis in an eight-hour work day. (Tr. 55). Dr. Smith opined that Plaintiff had no manipulative, visual, communicative, or environmental limitations, and she was "capable of light work." (Tr. 56).

Plaintiff visited Dr. Hatfield on May 2, 2013 (Tr. 309-10). Dr. Hatfield observed that Plaintiff's weight had decreased eight pounds since her last appointment and her "main complaint today is pain in her left hip." (Tr. 310). Dr. Hatfield ordered an x-ray of her left hip and referred her to Dr. Thomas Graber. (Id.).

On July 8, 2013, Dr. Graber diagnosed Plaintiff with sciatica. (Tr. 285). A left hip MRI without contrast revealed: mild degenerative changes of the hip and sacroiliac joints as well as degenerative changes involving the pubic symphysis and lower lumbar spine; tendinosis involving the gluteus minimus and medius tendons at their trochanteric attachments bilaterally; left-sided sub gluteus medius bursitis; tiny bone spur involving the left lesser trochanter; greater trochanteric bursitis bilaterally; tendinosis with superimposed partial tears involving the common hamstring tendons at their ischial tuberosity attachments bilaterally; and a small right ovarian cyst. (Tr.289-90). A lumbar spine MRI without contrast showed: stable S-shaped thoracolumbar scoliosis, convex left at L1-2 and convex right at L3-4; mild lumbar degenerative spondylosis which is unchanged compared to 11/13/2012; and mild disc osteophyte complex L1-2 with small left posterolateral disc protrusion. (Tr. 286-87).

During an appointment with Dr. Hatfield on September 5, 2013, Plaintiff's "only complaint is her arthritis and she is having problems with her feet." (Tr. 307-08). Dr. Hatfield observed that Plaintiff was "very talkative. Apparently they had a big garden this year and put up 17 dozen ears of corn, had pretty good tomatoes, etc." (Tr. 308). Dr. Hatfield referred Plaintiff to Dr. Clint Vanlandingham for a podiatry consult, and he continued her Crestor, Lotrel, Feldene, Prilosec, and Gaviscon. (Tr. 307-08).

Dr. Vanlandingham, a podiatrist, examined Plaintiff on September 17, 2013. (Tr. 280-81). Plaintiff informed Dr. Vanlandingham that "she has pain in her feet, she has hammertoes,

her toenails are thick, and she gets occasional foot cramps." (Tr. 280). Dr. Vanlandingham diagnosed Plaintiff with: diabetes mellitus without any sign of vascular disease or neuropathy, hallux valgus right, metatarsus abductus bilateral, and onychomycosis bilateral. (Tr. 281). He provided her orthotics. (Id.).

Plaintiff saw Dr. Hatfield in November 2013 for an earache, sinusitis, and pharyngitis. (Tr. 305). She returned to his office on January 8, 2014 for a check-up. (Tr. 304). Plaintiff was "doing well" and "[d]enie[d] any new complaints other than she thinks she has fibromyalgia and she wants to go see Dr. Choudhary for consult." (Id.). On January 21, 2014, Dr. Hatfield removed seven benign lesions from Plaintiff's neck. (Tr. 302).

Dr. Shahid Choudhary examined Plaintiff on January 28, 2014. (Tr. 275-76). Plaintiff complained of: stiffness in her neck; numbness and tingling in her arms, hands, and feet; headaches; shortness of breath and chest pain; heartburn; nausea and vomiting; increased urinary frequency; muscle and back pain; memory problems; and difficulty sleeping. (Tr. 275). Dr. Choudhary diagnosed possible carpal tunnel syndrome, possible peripheral neuropathy, and tension headaches, and he scheduled an EMG nerve conduction study of the upper extremities. (Tr. 276).

On February 20, 2014, after the EMG nerve conduction studies, Dr. Choudhary noted that Plaintiff had "moderate to severe carpal tunnel syndrome bilaterally." (Tr. 274). He recommended surgical intervention, but Plaintiff objected because "she knows that she's not going to get better even after the surgery." (Id.). Dr. Choudhary gave Plaintiff samples of Neupro for restless leg syndrome. (Id.).

Plaintiff visited Dr. Stanley Jones for her bilateral hand pain on February 27, 2014. (Tr. 283-84). Dr. Jones noted the following impressions: "Rounded lucencies seen at the bilateral

second metacarpal heads which raise possibility of subtle erosions versus nonspecific subchondral cysts." (Tr. 284).

Plaintiff discussed Dr. Jones's examination and recommendations with Dr. Choudhary on March 21, 2014. (Tr. 273). Although Dr. Jones suggested surgery, Plaintiff "did not want to have surgery at this time." (Id.). Dr. Choudhary informed Plaintiff that "she should start using braces as she does not want to have surgery for carpal tunnel syndrome." (Id.). Plaintiff reported that the Neupro helped her legs, but caused "weird dreams and drowsiness," and she expressed concern "about the possibility of fibromyalgia." (Tr. 273). Dr. Choudhary referred Plaintiff to Dr. Geetha Komatireddy. (Id.).

Plaintiff saw Dr. Komatireddy for chronic pain on April 1, 2014. (Tr. 324-28). Dr. Komatireddy noted:

> She has pain, extreme shortness of breath and she has history of bleeding ulcers and is here because she wanted to make sure what she has, but she has brought along with her a [S]ocial [S]ecurity disability form for fibromyalgia and she states she has read all about fibromyalgia and she thinks she has all these symptoms . . . .

(Tr. 324). Dr. Komatireddy concluded that a diagnosis of fibromyalgia was "possible, but [Plaintiff] is well [versed] with it so I have a hard time deciding the extent and degree of it because she exhibited severe tenderness and severe pain even with mild touch, she may be better off getting a second opinion." (Tr. 327).

Dr. Hutson, completed a Medical Source Statement for Plaintiff on April 13, 2014 (Tr. 330-32). Dr. Hutson stated that Plaintiff suffered "left sacroiliac and lumbar pain, constant but worse with activity, severity up to 10/10." (Tr. 330). Dr. Hutson opined that, as a result of Plaintiff's condition, Plaintiff was able to carry ten pounds or less frequently, twenty pounds or less occasionally, and fifty pounds rarely. (Tr. 331). According to Dr. Hutson, Plaintiff had no

limitations with reaching, handling, or fingering, and she could: balance and crawl frequently, crouch occasionally, and twist or stoop rarely. (Id.). Dr. Hutson estimated that Plaintiff could: sit one hour at a time before needing to change positions; sit a total of four hours in an eight-hour working day; stand twenty minutes before needing to sit down or walk around; and stand a total of four hours in an eight-hour workday. (Id.). Dr. Hutson estimated that Plaintiff required five-minute, unscheduled work breaks every thirty to forty-five minutes and would miss work or leave early approximately four days per month. (Tr. 332).

C. Standard for Determining Disability Under the Act

Eligibility for disability benefits under the Act requires a claimant to demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920. Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of

the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

### D. The ALJ's Determination

The ALJ applied the five-step evaluation process set forth in 20 C.F.R. § 404.1520 and found that Plaintiff: (1) had not engaged in substantial gainful activity since November 4, 2012; (2) had the severe impairments of degenerative disc disease and obesity and the non-severe impairment of carpal tunnel syndrome; and (3) did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (Tr. 13-27).

The ALJ found that Plaintiff had the residual functional capacity (RFC) "to perform light work as defined in 20 CFR 404.1567(b), except she is limited to no more than occasional climbing of ladders, ropes, and scaffolds; and is limited to occasional stooping, kneeling, crouching, and crawling." (Tr. 16). The ALJ noted that Plaintiff complained of the following limitations: severe lower back pain; frequent pain, numbness, and weakness in the bilateral hands; frequent extreme shortness of breath; fatigue; difficulties lifting more than ten pounds, standing more than five minutes, and walking more than twenty-five feet; and a need to frequently change positions and lie down throughout the day. (Tr. 16-17). Although the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," he believed Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not generally credible . . . ." (Tr. 17).

The ALJ summarized Plaintiff's medical records and noted that he "considered the effects of [Plaintiff's] obesity" when determining her RFC. (Tr. 17-20). In regard to medical

opinion evidence, the ALJ gave "significant weight" to the opinion of Dr. Smith, the State agency consultant, "because he had access to the majority of the evidence of record at the time his opinions were formulated" and his "opinions and analysis are very consistent with the evidence of record as a whole." (Tr. 20). The ALJ gave "no weight" to the opinion of Dr. Hutson because she was not an acceptable medical source, she treated Plaintiff only briefly in February and March 2012, and the treatment records from that time period did not support the limitations she found in her report of April 2014. (Id.).

The ALJ found that "deconditioning associated with [Plaintiff's] severe obesity is the primary cause of the majority of her alleged symptoms." (Tr. 21). The ALJ reasoned that Plaintiff's lack of effort to lose weight, despite "numerous recommendations to lose a significant amount of weight through either diet and exercise, or through bariatric surgery," as well as her refusal to consider carpal tunnel release surgery, "indicates that the severity of her impairments is not as limiting as she alleges." (Id.). The ALJ further found that "[i]nstead of accepting and following the advice of her doctors," Plaintiff "has been simply looking for medical diagnoses [such as fibromyalgia] to justify her current status . . . ." (Id.).

The ALJ discredited Plaintiff's testimony that, beyond picking an occasional tomato, she was no longer able to garden. (Id.). The ALJ noted that Plaintiff discussed her garden with Dr. Hatfield during several appointments in 2012 and 2013, and he found "it very difficult to believe that [Plaintiff] would consistently be so excited about discussing her garden with her primary care physician if she was not actively involved with the associated garden maintenance." (Id.). The ALJ also observed that Plaintiff "continues to perform a variety of household chores such as doing the dishes, doing the laundry, and sweeping the floors" and "[d]espite her recently

13

diagnosed carpal tunnel syndrome,…she continues to use her computer as needed while at home." (Id.).

The ALJ determined that Plaintiff "is capable of performing her past relevant work as a production clerk and machine operator" because those jobs did "not require the performance of work-related activities precluded by [Plaintiff's] residual functional capacity[.]" (Id.). Based on the vocational expert's testimony and Plaintiff's RFC, the ALJ concluded that Plaintiff "is able to perform these jobs as both actually performed by [Plaintiff] and as generally performed in the national economy." (Tr. 22).

### III. Judicial Review

A. Standard of Review

The court must affirm the ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quotation omitted). In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). However, the court "do[es] not reweigh the evidence presented to the ALJ and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reason and substantial evidence." Renstrue v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).

"If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011) (quoting

Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). The Eighth Circuit has repeatedly held that a court should "defer heavily to the findings and conclusions" of the Social Security Administration. Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001).

B. Plaintiff's Arguments

Plaintiff claims the ALJ erred in failing to: (1) designate her bilateral carpal tunnel syndrome a severe impairment; and (2) incorporate related limitations in the RFC assessment. Respondent counters that the record supports the ALJ's findings that Plaintiff's carpal tunnel syndrome was a non-severe impairment and the ALJ properly considered the effect of Plaintiff's carpal tunnel syndrome on her ability to work when formulating the RFC.

1. Non-Severe Impairment

Plaintiff first argues that the ALJ failed to properly consider her carpal tunnel syndrome at step two of the sequential evaluation. In particular, Plaintiff challenges the ALJ's findings relating to the duration of the impairment and the likelihood of improvement. Respondent maintains that Plaintiff's application for benefits, questionable credibility, and activities of daily living, as well as the recentness of the diagnosis, supported the ALJ's findings that the impairment was not severe.

To establish entitlement to disability benefits, a claimant must have a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C.§ 423(d)(1)(A); 20 C.F.R. §§ 404.1505(a), 404.1509. An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). An impairment is non-severe when it amounts only to a slight abnormality which would have no

15

more than minimal effect on an individual's ability to work. Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007). "To be found disabled, an individual must have a medically determinable 'severe' physical or mental impairment or combination of impairments that meets the duration requirement." SSR 96-3p.

A claimant bears the burden of establishing that an impairment is severe. Id. "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard, and [the Eighth Circuit has] upheld on numerous occasions the Commissioner's finding that a claimant failed to make this showing." Id. (internal citation omitted).

Here, the ALJ found that Plaintiff's "recently diagnosed carpal tunnel syndrome" was non-severe because "the evidence of record fails to indicate that this impairment is expected to cause associated symptomatic limitations that have more than minimal effect on [Plaintiff's] ability to perform basic work activities for at least 12 consecutive months." (Tr. 15-16). The ALJ further wrote: "In consideration of the recency of [Plaintiff's] carpal tunnel syndrome diagnosis, it is reasonable to assume that her carpal tunnel symptoms will likely improve to a significant degree with appropriate treatment." (Tr. 16).

Despite finding Plaintiff's carpal tunnel syndrome to be non-severe, the ALJ considered this an impairment when assessing Plaintiff's RFC. (Tr. 19). The ALJ noted that, in January 2014, Plaintiff complained to Dr. Chadhoury about intermittent tingling and numbness in her arms and hands. (Id.). In February 2014, Plaintiff underwent a nerve conduction study, which revealed bilateral carpal tunnel syndrome, but she declined the recommended surgery because "she knows she's not going to get better even after surgery." (Id.). In March 2014, Dr. Chadhoury again recommended carpal tunnel release surgery, and Plaintiff again declined. (Id.).

The ALJ concluded that Plaintiff's refusal to consider the recommended surgery suggested "that the severity of her impairments is not as limiting as she alleges." (Tr. 21). Where, as here, a plaintiff demonstrates disinterest in a recommended surgical intervention, an ALJ's determination that a claimed disability is a non-severe impairment is proper. See Hensley v. Colvin, No. 15-2819, 2016 WL 3878219, *4 (8th Cir. July 18, 2016) (refusing surgery suggests a condition is not disabling); Goodale v. Halter, 257 F.3d 771, 774 (8th Cir. 2001) (plaintiff's refusal to undergo surgery reflected the plaintiff's "own judgment that her carpal tunnel syndrome was something she could live with.").

The ALJ also considered evidence that Plaintiff regularly used her hands in daily activities. As previously discussed, the ALJ noted that Plaintiff "continues to perform a variety of household chores such as doing the dishes, doing the laundry, and sweeping the floors," "use[s] her computer as needed at home," and "continues to be actively involved in gardening activities." (Id.). See Johnston v. Apfel, 210 F.3d 870, 875 (8th Cir. 2000) (finding the inconsistencies between the plaintiff's subjective complaints, the medical record, and her daily activities supported the ALJ's determination that plaintiff's impairments were not severe).

Plaintiff argues the ALJ erred in "his consideration of carpal tunnel syndrome in that the ALJ determined that the impairment did not last for 12 months." (ECF No. 10 at 9). However, Plaintiff misstates the ALJ's finding. Rather, the ALJ wrote that the evidence failed to suggest that the impairment "is expected to cause…limitations that have more than a minimal effect on [Plaintiff's] ability to perform basic work activities for at least 12 consecutive months." (Tr. 16). Given that the Social Security Act defines "disability" as an impairment "which has lasted or can be expected to last for a continuous period of not less than 12 months," 42 U.S.C.§ 423(d)(1)(A), the ALJ did not apply an improper standard.

Additionally, Plaintiff asserts that the record did not support the ALJ's finding that her carpal tunnel syndrome was likely to improve "to a significant degree with appropriate treatment." Plaintiff correctly notes that no treating or consulting physician commented upon Plaintiff's potential for improvement. However, the record contains evidence of actual improvement. Plaintiff received her diagnosis in February 2014 and, a mere three months later at her May 2014 administrative hearing, testified that wearing wrist braces and taking Piroxicam decreased her pain. (Tr. 38, 24). Such testimony supported the ALJ's finding that, with appropriate treatment, Plaintiff's impairment would likely improve. See Renstrom v. Astrue, 680 F.3d 1057, 1066 (8th Cir. 2012) (conditions that can be controlled by treatment are not disabling); Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009) (same).

For the above reasons, the Court finds that substantial evidence supported the ALJ's decision not to include bilateral carpal tunnel syndrome among Plaintiff's severe impairments. Moreover, even if the ALJ erred in not finding carpal tunnel syndrome to be a severe impairment at step two, such error was harmless because the ALJ considered all of Plaintiff's impairments, severe and non-severe, when formulating her RFC. See, e.g., Spainhour v. Astrue, No. 11-1056, 2012 WL 5362232, *3 (W.D. Mo. 2012).

    2. RFC

Finally, Plaintiff asserts that the ALJ erred in assessing her RFC because he did not include specific limitations relating to her carpal tunnel syndrome. Respondent counters that substantial evidence in the record, as well as the ALJ's finding that Plaintiff was not entirely credible, supported the ALJ's decision not to incorporate manipulative limitations in the RFC.

RFC is "the most [a claimant] can still do despite" his or her physical or mental limitations. 20 C.F.R. § 404.1545(a)(1). See also Masterson v. Barnhart, 363 F.3d 731, 737 (8th

Cir. 2004). "The ALJ should determine a claimant's RFC based on all relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (quotation omitted). Additionally, "the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 98-8p. The claimant bears the burden of proving disability and demonstrating his or her RFC. Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011).

Based on his review of the record and Plaintiff's testimony at the hearing, the ALJ found that Plaintiff had the RFC to perform light work "except she is limited to no more than occasional climbing of ladders, ropes, and scaffolds; and is limited to occasional stopping, kneeling, crouching, and crawling." (Tr. 16). In determining Plaintiff's RFC, the ALJ expressly referred to her carpal tunnel syndrome and found no evidence that it limited her ability to work. Plaintiff's treating and consulting physicians neither imposed restrictions on the use of her hands nor opined that her carpal tunnel syndrome resulted in work-related limitations. The only evidence in the record relating to Plaintiff's ability to use her hands comes from Plaintiff herself and, as previously discussed, the ALJ found her "not entirely credible."[1] Furthermore, evidence of Plaintiff's daily activities (including washing dishes, doing laundry, sweeping, and using a computer) supported the ALJ's decision not to include gripping or manipulative limitations.

Accordingly, the ALJ properly considered Plaintiff's carpal tunnel syndrome as it related to her functional limitations when assessing her RFC. Because the RFC determination is consistent with the level of treatment sought and the evidence of Plaintiff's daily activities,

---

[1] Specifically, the ALJ disbelieved Plaintiff's statements concerning the intensity and limiting effects of her symptoms because: Plaintiff did not follow her physicians' medical advice; appeared to be seeking "medical diagnoses to justify her current status"; and engaged in daily activities inconsistent with her alleged impairments. (Tr. 21). Importantly, Plaintiff does not challenge the ALJ's findings relating to her credibility.

substantial evidence supports the RFC finding. "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." Travis v. Astrue, 477 F.3d 1037, 1040 (8th Cir. 2007).

## IV. Conclusion

For the reasons discussed above, the undersigned finds that substantial evidence in the record as a whole supports the Commissioner's decision that Plaintiff is not disabled. Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying Social Security benefits to Plaintiff is **AFFIRMED.**

A separate judgment in accordance with this Memorandum and Order is entered this date.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 28th day of September, 2016.